In re the GLACIER BAY.

No. A88–115 Civil.

United States District Court,
D. Alaska.

Sept. 28, 1990.

Brian B. O'Neill, Faegre & Benson, Minneapolis, Minn., Liaison Counsel, for plaintiffs.

Michael H. Woodell, Bradbury, Bliss & Riordan, Anchorage, Alaska, Liaison Counsel, for defendants.

R. Michael Underhill, Torts Branch, Civ. Div., U.S. Dept. of Justice, San Francisco, Cal., for the Government.

## ORDER

HOLLAND, Chief Judge.

*Phase I Motions and Motions to Dismiss*

On August 23, 1990, the court heard oral argument on several related motions. Those motions were: plaintiffs' Phase I motions regarding the scope of compensatory damage recovery; the Fund's motion to dismiss claims of fish tenders and pro-

cessors; Trinidad, West, Hawker, Kee, Mathiasen's, and GBTC's Rule 12(b)(6) motion to dismiss claims of tenders, fish buyers, fish spotters, fish processors, and other shoreside businesses; and the Fund's motion to dismiss plaintiffs' prayer for attorney's fees.

Plaintiffs' combined Phase I motions request declaratory rulings on the following four issues:

(1) Whether the business losses of drift net and set net fishermen are compensable damages under the Trans–Alaska Pipeline Authorization Act (TAPAA), 43 U.S.C. §§ 1651–1655, and under the Alaska Environmental Conservation Act ("Alaska Act"), AS 46.03.822.

(2) Whether the business losses of nonfishermen are compensable damages under TAPAA and the Alaska Act.

(3) Whether the claims filed by all plaintiffs are timely filed.

(4) Whether, under TAPAA and the Alaska Act, plaintiffs can recover costs and disbursements, attorney's fees, pre-judgment interest at 10.5%, and post-judgment interest at 10.5%.

Plaintiffs raise these issues at this time pursuant to Section 15.4 of the Case Management Plan which specifically permits Phase I motions for the determination of questions of law relating to the scope of recovery under TAPAA and for the definition of categories of plaintiffs entitled to recovery under TAPAA or the Alaska Act.

In response to plaintiffs' Phase I motions, Trinidad filed two opposition briefs: one on the issue of attorney's fees and the other on the issue of claims for economic loss. Trinidad filed supplemental authority regarding attorney's fees. CIRO, SPC Shipping, and Tesoro joined in Trinidad's opposition brief on attorney's fees. SPC Shipping filed a separate opposition brief as to economic loss. The Fund and the United States each filed opposition briefs. Plaintiffs filed a reply.

The Fund and Trinidad filed separate motions to dismiss the economic loss claims of

certain non-fishermen plaintiffs. SPC Shipping filed a brief in support of both motions to dismiss. Plaintiffs objected to the motions to dismiss. SPC Shipping, Trinidad, and the Fund each filed replies.

The Fund also filed a motion to dismiss the claims for attorney's fees. Plaintiffs filed an opposition brief to which the Fund replied.

I.

## APPLICATION OF MARITIME LAW

The applicability of maritime law is the underlying issue for most of the pending motions, particularly for those addressing economic loss claims. The issues raised are whether TAPAA preempted maritime law and whether damages under the Alaska Act are controlled by maritime law or by state law as a result of the non-preemption of state law subsection in TAPAA.

### TAPAA

This court has already ruled that Section 1653(c) preempted the Limitation of Vessel Owner's Liability Act ("Limitation Act"), 46 U.S.C.App. §§ 181–189, for spills of oil transported through the Trans–Alaska Pipeline System ("TAPS oil").[1] In view of that prior ruling, the issue more specifically becomes whether TAPAA Section 1653(c) preempts only the Limitation Act or all applicable maritime law.

The defendants argue that the oil spill from the *Glacier Bay* is a maritime tort. Defendants contend that, as a maritime tort, this matter is subject to substantive maritime law. Defendants cite to other oil spill cases not involving TAPS oil where similar conclusions were reached. *See, e.g., Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1031–1032 (5th Cir. 1985); *In re Oil Spill by Amoco Cadiz,* 699 F.2d 909, 913 (7th Cir.1983); *Union Oil Company v. Oppen,* 501 F.2d 558, 561–562 (9th Cir.1974).

The particular substantive maritime law which defendants insist must be applied is the ruling in *Robins Dry Dock & Repair*

---

**1.** Order on motions to dismiss limitation complaint (Apr. 13, 1990) 741 F.Supp 800.

Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). In essence, *Robins Dry Dock* established that in those situations where negligence does not result in any physical harm, thereby providing no basis for an independent tort, and only pecuniary loss is suffered, a plaintiff may not recover for the loss of the financial benefits of a contract or prospective trade. *Getty Refining & Marketing Co. v. MT FADI B*, 766 F.2d 829, 833 (3d Cir.1985). If the *Robins Dry Dock* rule is applied to the *Glacier Bay* oil spill, the claims of fish tenders, fish buyers, fish spotters, fish processors and shoreside businesses would largely be dismissed.

Defendants take the position that the *Robins Dry Dock* rule has withstood the test of time and continues to be viable law. *See M/V Testbank*, 752 F.2d at 1032; *Getty Refining*, 766 F.2d at 833; *see also*, Owen, *Recovery for Economic Loss Under U.S. Maritime Law: Sixty Years Under Robins Dry Dock*, 18 J.Mar.L. & Com. 157 (1987). Defendants contend that Section 1653(c) is silent as to the well-established *Robins Dry Dock* rule and, consequently, does not preempt it. Defendants further argue that the administrative regulations implementing TAPAA are not entitled to any deference.

Plaintiffs, on the other hand, argue that maritime law does not apply because they originally brought their claims in state court pursuant to the "saving to suitors" clause in 28 U.S.C. § 1333(1). Plaintiffs note that it was defendants who removed the case to this court on the grounds that TAPAA claims raised federal question jurisdiction. Plaintiffs further note that they did not invoke admiralty jurisdiction as required by Rule 9(h), Federal Rules of Civil Procedure, and have requested a jury, which is not available in admiralty.

Plaintiffs argue that maritime law does not apply to TAPAA claims because of the plain language of Section 1653(c)(1) that strict liability was imposed "notwithstanding the provisions of any other law." Plaintiffs contend that the legislative history and implementing regulations support preemption of maritime law.

Finally, plaintiffs argue that they would be able to recover their economic loss claims even if general maritime law did apply because the Ninth Circuit has eroded the "bright-line" rule of *Robins Dry Dock. See Carbone v. Ursich*, 209 F.2d 178, 181–182 (9th Cir.1953) (held that crew members of fishing vessel could recover lost profits from owners of another vessel that negligently fouled their nets); *Union Oil Co. v. Oppen*, 501 F.2d 558, 570 (9th Cir.1974) (held that commercial fishermen whose harvests were depleted by an oil spill could recover lost profits from defendant oil company in negligence action); *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise*, 732 F.2d 1468, 1475 (9th Cir.1984) (held that economic losses such as lost profits and repair expenses are recoverable in manufacturers strict liability admiralty action).

■ Plaintiffs' position that maritime law does not apply because admiralty jurisdiction was not invoked is not supported in the law. The oil spill involved here constitutes a maritime tort because it occurred on navigable waters and bears a significant relationship to traditional maritime activity. *Sisson v. Ruby*, —— U.S. ——, 110 S.Ct. 2892, 2897, 111 L.Ed.2d 292 (1990); *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972); *In re Paradise Holdings, Inc.*, 795 F.2d 756, 759 (9th Cir. 1986). The substantive law applicable to a maritime tort is the general maritime law. *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1320 (11th Cir.1989). The same principles would govern the outcome had this case remained in state court where it was originally filed or had this court's admiralty jurisdiction been invoked. *Id.* at 1321.

■ Unless it is determined that TAPAA preempts the application of substantive maritime law, maritime law applies regardless of the fact that plaintiffs did not invoke the procedural benefits of admiralty jurisdiction. Rule 9(h) is a purely procedural provision which permits a plaintiff whose claim is cognizable under either law or admiralty jurisdiction to identify his claim as an admiralty claim in order to obtain the

procedural benefits traditionally available under admiralty jurisdiction, such as insuring a bench trial. *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 206 (1st Cir. 1988). Rule 9(h) does not authorize a plaintiff to choose the substantive law that applies to that claim. *Id.* Likewise, the "saving to suitors" clause of 28 U.S.C. § 1333(1) does not give a plaintiff an election to determine whether the defendant's liability is measured by common law standards or by those of the maritime law. *Chelentis v. Luckenbach Steamship Co.*, 247 U.S. 372, 384, 38 S.Ct. 501, 504, 62 L.Ed. 1171 (1918).

■ Plaintiffs' second argument, that the clear language of Section 1653 preempts maritime law, does have merit. The applicable portion of TAPAA is Section 1653(c)(1), which reads as follows:

(1) *Notwithstanding the provisions of any other law,* if oil that has been transported through the trans-Alaska pipeline is loaded on a vessel at the terminal facilities of the pipeline, the owner and operator of the vessel (jointly and severally) and the Trans–Alaska Pipeline Liability Fund established by this subsection, shall be strictly liable without regard to fault in accordance with the provisions of this subsection for *all damages,* including clean-up costs, sustained by *any person* or entity, public or private, including residents of Canada, as the result of discharges of oil from such vessel.

(Emphasis added.)

The defendants would interpret the phrase "notwithstanding any other provision of law" to mean that Section 1653(c) should not be limited by other statutes, such as the Limitation Act. Defendants argue that the phrase "provision of law" refers only to statutory law and not to non-statutory maritime law, such as *Robins Dry Dock.*

Arguably, there is authority to support such a reading. *United States ex rel. Office of Independent Counsel v. Fernandez*, 887 F.2d 465, 468 (4th Cir.1989) ("notwithstanding" proviso means conferral of prosecutorial powers should not be limited

by other statutes). However, since the focus of Section 1653(c) was strict liability for environmental harm, it is not reasonable to interpret the phrase so narrowly as to eliminate recovery for just such harm. Rather, it must be read to mean that Section 1653(c) was not to be modified by any preexisting law, whatever its source. *See In re Oswego Barge Corp.*, 664 F.2d 327, 340 (2d Cir.1981) ("notwithstanding" phrase in Federal Water Pollution Control Act is not a preservation of preexisting bases of recovery in non-statutory maritime law).

Defendants also argue that, aside from the general "notwithstanding" clause, the statute is silent as to the well-established *Robins Dry Dock* rule. Defendants contend that the *Robins Dry Dock* rule must therefore apply. They read "all damages, including clean-up costs, sustained by any person or entity" in Section 1653(c)(1) to mean: all damages otherwise compensable under the maritime law and not subject to any strict liability defenses under TAPAA are recoverable by all persons who suffer such compensable damages. Defendants note that "damages" is not a defined term in TAPAA. *But see* Oil Pollution Act of 1990, Pub.L. No. 101–380, 136 Cong.Rec. H6256–H6257 (daily ed. Aug. 1, 1990) (Section 8102(c) amends TAPAA Section 1653(c) to define damages as including certain items, but as not being limited to those items).

■ Statutes which invade the general maritime law are read with a presumption favoring the retention of long-established and familiar principles except when a statutory purpose to the contrary is evident. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952). In determining the preemptive effect of a statute, the court must assess the scope of the legislation and whether the legislative scheme addresses the problem formerly governed by maritime common law. *Gardiner v. Sea–Land Service, Inc.*, 786 F.2d 943, 947 (9th Cir.1986). The purpose of Section 1653(c) is to provide adequate compensation for damage caused by spills of TAPS oil. H.R. Conf.Rep. No. 624,

93d Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.Code Cong. & Admin.News 2523, 2530 (herein "Conference Report"). In *Benefiel v. Exxon Corp.*,[2] a case involving the *Exxon Valdez* oil spill, Judge Gadbois ruled that:

> Congress enacted [Section 1653(c)] against a background of well-established maritime law, and under settled principles of statutory construction Congress must be deemed to have incorporated in [Section 1653(c)] the maritime rule of *Robins Dry Dock* that there can be no recovery for economic loss absent physical injury.

However, Judge Gadbois addressed neither the impact of the "notwithstanding the provisions of any other law" clause contained in Section 1653(c)(1) nor the congressional purpose in enacting Section 1653(c).

Section 1653(c)(1) establishes strict liability for damages from such oil spills up to $100 million. Conference Report at 2530. Defendants argue that establishing strict liability is the extent of Section 1653(c). However, Section 1653(c) specifically says "all damages" sustained by "any person". While that language does not address the *Robins Dry Dock* rule by name, it does address the subject matter of the rule, *i.e.*, recoverable damages.

If the "notwithstanding" clause is interpreted as including maritime common law and Section 1653 is not, therefore, read in the context of the *Robins Dry Dock* rule, the "all damages" language of Section 1653(c) would mean what the plain language of the statute says: all damages sustained by any person as a result of an oil spill. There would be no need to define "damages" in the original statute if it literally means *all* provable damages.

The Oil Pollution Act amendments to TAPAA provide as follows:

> (c) *Damages.*—Section 204(c) of the Trans–Alaska Pipeline Authorization Act (43 U.S.C. 1653(c)), as amended by this title, is further amended by adding at the end the following new paragraphs:

"(13) For any claims against the Fund, the term 'damages' shall include, but not be limited to—

"(A) the net loss of taxes, revenues, fees, royalties, rents, or other revenues incurred by a State or a political subdivision of a State due to injury, destruction, or loss of real property, personal property, or natural resources, or diminished economic activity due to a discharge of oil; and

"(B) the net cost of providing increased or additional public services during or after removal activities due to a discharge of oil, including protection from fire, safety, or health hazards, incurred by a State or political subdivision of a State.

> . . . ."

Oil Pollution Act of 1990, Pub.L. No. 101–380, § 8102(c), 136 Cong.Rec. H6256–H6257 (daily ed. Aug. 1, 1990). That amendment serves to clarify that certain actual damages perceived by Congress to have been incurred as a result of the more recent *Exxon Valdez* TAPS oil spill were indeed recoverable damages although clearly beyond the scope of the *Robins Dry Dock* rule.

The implementing regulations provide a definition which is entirely consistent with a literal reading of the term "all damages" in the statute and with the items of damage specified in the amendments:

> (e) "Damage" or "damages" means any economic loss, arising out of or directly resulting from an incident, including but not limited to:
>
> (1) Removal costs;
>
> (2) Injury to, or destruction of, real or personal property;
>
> (3) Loss of use of real or personal property;
>
> (4) Injury to, or destruction of, natural resources;
>
> (5) Loss of use of natural resources; or

---

**2.** No. CV 90–2184 RG (Ex), slip op. at 3 (C.D.Cal. July 27, 1990) (amended order dismissing complaint for failure to state a claim).

(6) Loss of profits or impairment of earning capacity due to injury or destruction of real or personal property or natural resources, including loss of subsistence hunting, fishing and gathering opportunities.

43 C.F.R. § 29.1 (1989). Normally, the court will defer to a reasonable interpretation of a statute by an agency charged to administer it. *Brooks v. Donovan,* 699 F.2d 1010, 1011 (9th Cir.1983).

Trinidad argues that the regulation purporting to define "damages" is not entitled to deference because it does not define what categories of claimants are entitled to recover damages under TAPAA. Trinidad alleges that the Department of the Interior merely borrowed the definition of damages from the Outer Continental Shelf Lands bill, which was under consideration by Congress at the time the TAPAA regulations were drafted, without expressly construing TAPAA. *See* 43 U.S.C. § 1813(a). Trinidad further argues that proposed regulations were not even promulgated until four years after TAPAA was enacted. Therefore, Trinidad concludes that those regulations cannot be considered to be a contemporaneous agency interpretation of damages. Furthermore, those regulations originally proposed were not even consistent with current regulations.

The authority for the Department of the Interior to promulgate regulations is not open to dispute. Section 1653(c)(4) provides in part that: "[t]he Fund shall be administered by the holders of the trans-Alaska pipeline right-of-way under regulations prescribed by the Secretary." The current regulations are noted merely because they harmonize with the plain language and purpose of TAPAA Section 1653(c), and not because the definition itself was determinative of whether maritime law was applicable. *See National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979).

■ Since the language of the statute is not ambiguous, it is not necessary to examine the legislative history. *Sierra Club v. Clark,* 755 F.2d 608, 615 n. 9 (8th Cir.1985).

However, it is not inappropriate for this court to examine the legislative history to ensure that the court has not misinterpreted the intent of Congress. *Id.; Heppner v. Alyeska Pipeline Service Co.,* 665 F.2d 868, 871 n. 1 (9th Cir.1981). In this case, the legislative history supports the conclusion that Congress intended to adequately compensate the victims of any oil spill. The Conference Report, which only briefly addresses Section 1653(c), states, in part, as follows:

The Conferees concluded that existing maritime law would not provide adequate compensation to all victims, including residents of Canada, in the event of the kind of catastrophe which might occur.

Conference Report at 2530. The inescapable conclusion is that Congress meant to provide adequate compensation by departing from maritime common law. *Contra Benefiel v. Exxon Corp.,* No. CV 90–2184 RG (Ex) (C.D. Cal. July 27, 1990) (Complaint dismissed when the court ruled TAPAA incorporated the *Robins Dry Dock* rule.).

In summary, the plain language of Section 1653(c) is that all provable damages sustained by any person as a result of a TAPS oil spill are compensable and are not limited by established maritime law. While neither the statute nor the legislative history specifically abrogated the *Robins Dry Dock* rule, the plain language and purpose of Section 1653(c) necessitates a derogation of maritime common law. Furthermore, the legislative history and the implementing regulations are entirely consistent with such a literal interpretation of Section 1653(c).

### Alaska Act

In their Phase I motions, plaintiffs also address whether claims for economic loss are recoverable by fishermen and non-fishermen under the Alaska Act. Trinidad's motion to dismiss the claims for economic loss likewise addresses the strict liability claims made under the Alaska Act. The Fund's motion to dismiss claims for economic loss did not include claims made un-

der the Alaska Act since the Fund's liability is confined to TAPAA claims.

Defendants argue that state law does not provide for recovery for economic loss under strict liability. There being no cases decided under the Alaska Act, defendants turned to the strict liability case law for products liability and ultrahazardous activities, both of which require physical harm for an award of damages for economic loss. Defendants further argue that state law is preempted by maritime law where a maritime tort is involved, such as is the case here. Defendants make the policy argument that to allow damages for economic loss without a requirement that there be physical harm would result in unlimited liability for shippers, a result which would serve to inhibit the continued development of the shipping industry. In addition, defendants contend that the plaintiffs' Phase I motions are premature because determination of this issue involves questions of fact.

Plaintiffs take the position that even under maritime law they could recover their claims for economic loss as a result of the Ninth Circuit's exceptions to the *Robins Dry Dock* rule. Plaintiffs assert that there is no dispute among the parties that commercial fishermen could recover their claims for economic loss. Plaintiffs further assert that the claims of tenders and other plaintiffs actively engaged in the commercial fishing industry are not sufficiently remote to remove them from the exception to the *Robins Dry Dock* rule already carved out for commercial fishermen by the Ninth Circuit.

█ Nevertheless, plaintiffs contend that the Alaska Act is not preempted by maritime law. TAPAA Section 1653(c)(9) authorized the states to impose additional requirements, and specifically stated that TAPAA did not preempt the field of strict liability. Plaintiffs interpret the Alaska Act as complementing TAPAA rather than as conflicting with maritime law. Furthermore, plaintiffs argue that the Alaska Act contains a "notwithstanding any other provision or rule of law" phrase which negates defendants' argument that Alaska common

law for strict liability does not allow recovery for economic loss. Plaintiffs advance the policy argument that the focus of the Alaska Act is to foster prevention rather than to limit liability. Even so, plaintiffs argue, liability would necessarily be limited by each plaintiff's ability to quantify and prove the damages claimed.

There is no basis for determining that maritime law preempts the application of the Alaska Act to TAPS oil spills. TAPAA clearly encouraged state legislation regarding liability for such oil spills. TAPAA Section 1653(c)(9) provides as follows:

(9) This subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements.

The Conference Report elaborates, at page 2531:

The States are expressly not precluded from setting higher limits or from legislating in any manner not inconsistent with the provisions of this Act.

To the extent that Alaska imposes strict liability in excess of $100 million, there is no conflict between TAPAA and the Alaska Act. However, under the grant of authority to the states, it would be inconsistent to impose the *Robins Dry Dock* rule from maritime law on state claims when that rule does not apply to TAPAA claims.

█ Since the Alaska Act is not preempted by maritime law, the issue is whether the Alaska Act imposes a physical harm requirement for recovery of damages for economic loss. The Alaska Act was amended on May 13, 1989, and made retroactive. Temporary and Special Acts (§ 8, ch. 39, SLA 1989). As amended, the Alaska Act reads in part as follows:

*Sec. 46.03.822. Strict liability for the release of hazardous substances.* (a) *Notwithstanding any other provision or rule of law* and subject only to the defenses set out in (b) of this section and the exception set out in (i) of this section, the following persons are strictly liable, jointly and severally, for damages to persons or property, whether public or private, including damage to the natural resources of the state or a municipality,

and for the costs of response, containment, removal, or remedial action incurred by the state or a municipality, resulting from an unpermitted release of a hazardous substance or, with respect to response costs, the substantial threat of an unpermitted release of a hazardous substance[.] [3]

(Emphasis added.) The "notwithstanding" phrase would mean: notwithstanding preexisting law including state strict liability common law.

"Damages" are defined in AS 46.03.824:

Sec. 46.03.824. *Damages*. Damages include but are not limited to injury to or loss of persons or property, real or personal, loss of income, loss of the means of producing income, or the loss of an economic benefit.

"Economic benefit" is defined in AS 46.-03.826(2) as follows:

Sec. 46.03.826. *Definitions*. In AS 46.03.822–46.03.828

. . . .

(2) "economic benefit" means a benefit measurable in economic terms, including but not limited to the gathering, catching, or killing of food or other items utilized in a subsistence economy and their replacement cost;

Neither of these definitions impose a physical harm requirement in order for damages for economic loss to be awarded.

### Conclusion

In view of the clear language of both TAPAA and the Alaska Act, which necessitates the conclusion that the *Robins Dry Dock* rule does not limit recoveries under either act, there is no need to discuss plaintiffs' argument that damages for economic loss would be recoverable by non-fishermen plaintiffs under *Robins Dry Dock* as it is interpreted by the Ninth Circuit. Furthermore, defendants' argument that the issues regarding recoverable damages are untimely raised is foreclosed by the Case Management Plan.

Plaintiffs' Phase I motions are granted to the extent that it is determined that provable economic loss is recoverable under both TAPAA and the Alaska Act by both fishermen and nonfishermen without evidence of physical harm. Trinidad's motion to dismiss the claims for economic loss is denied as to claims asserted under either TAPAA or the Alaska Act. The Fund's motion to dismiss claims for economic loss is denied as to claims asserted under TAPAA.

## II.

### STATUTE OF LIMITATIONS

Plaintiffs' Phase I motions also request a declaratory ruling that all claims filed by plaintiffs have been timely filed. The issue arises because the original complaints were filed as class actions which tolled the running of the limitations period.

The statute of limitations was first raised when the parties prepared the notice that the class was denied certification. Specifically, the question was whether the three-year limitation period of 43 C.F.R. § 29.9(i) (1987) applied, or the post-spill two-year period of 43 C.F.R. § 29.9(i) (1988) applied. The Fund and plaintiffs stipulated to a March 31, 1990, deadline for TAPAA claims as a compromise.[4] Therefore, the statute of limitations issue is moot as to TAPAA claims.

As to the state claims, the parties agree that the applicable limitations period is two years as provided in AS 09.10.070. The oil spill began on July 2, 1987. Therefore, the earliest possible date for the limitations period to have expired is July 2, 1989. Most plaintiffs filed their claims prior to July 2, 1989, so there is no dispute as to them. Plaintiffs represent that there is also no dispute as to the putative class members who filed prior to March 31, 1990, but after July 2, 1989, because the class action complaints tolled the running of the statute of limitations for those plaintiffs.

---

**3.** "Hazardous substance" is defined in AS 46.03.-826(5)(B) to include oil.

**4.** Order granting motion to establish final date for filing of further TAPS Act claims (Feb. 20, 1990).

As represented by plaintiffs, the disputed claims involve only nine plaintiffs.[5]

Defendants SPC Shipping and Trinidad argue that unresolved factual issues make the statute of limitations issue premature for determination. Those factual issues are whether each claimant suffered actual damage and, if so, when; and whether each claimant was a member of a putative class and, if not, what is the relationship of the claimant to the putative class. Trinidad also argued that the claims of non-class members do not relate back under Rule 15(c), Federal Rules of Civil Procedure. Trinidad claims it would be prejudiced if such claims related back because it was not able to conduct a timely investigation of those types of damages.

Plaintiffs argue that the only facts necessary to determine the statute of limitations issue are the various filing dates. Of the non-class plaintiffs whose claims are disputed for timeliness, plaintiffs contend that the McGahan Third Amended Complaint, lodged on June 30, 1989, takes care of all but two plaintiffs. Plaintiffs further contend that those two claims relate back under Rule 15 and that there would be no prejudice to defendants since discovery on all claims began only after the Case Management Plan was approved.

■ There is no question that the class complaints tolled the running of the limitations period for the putative class members who filed after July 2, 1989. *Chardon v. Fumero Soto*, 462 U.S. 650, 661, 103 S.Ct. 2611, 2618, 77 L.Ed.2d 74 (1983); *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *see* Note, *Limitation Tolling When Class Status Denied: Chardon v. Fumero Soto and Alice in Wonderland*, 60 Notre Dame L.Rev. 686 (1985). The parties disagreed as to the amount of time the limitations period was tolled by the class complaints. When they prepared a notice of the denial of class certification, the parties agreed that the statute of limitations was tolled for at least one year from the denial of the motion for class certification as to some plaintiffs (UCIDA) and from the abandonment of class claims as to other plaintiffs (McGahan). The notice ultimately distributed did not set any deadline for filing individual claims. The McGahan plaintiffs abandoned their class claims on August 2, 1989, so those plaintiffs had, by agreement, until at least August 2, 1990. The UCIDA plaintiffs did not have their class certification motion denied until September 26, 1989, so they had by agreement until at least September 26, 1990.

The putative class members who could file even though the original two-year limitations period ran out July 2, 1989, are: commercial salmon drift net and set net fishermen, fish tenders, commercial fishing deckhands and helpers, and processor employees.

■ Of the non-putative class members who filed after July 2, 1989, most were included in the McGahan Third Amended Complaint or the first summary amendment to it. The third amended complaint was lodged June 30, 1989, along with a filed motion for leave to amend. The order granting leave was entered August 2, 1989. Once plaintiffs filed the proposed third amended complaint accompanied by a motion for leave to amend within the statutory period, the statute of limitations was tolled even though the court order granting leave to amend and the technical filing of the third amended complaint occurred after the running of the limitations period. *Eaton Corp. v. Appliance Valves Co.*, 634 F.Supp. 974, 982–983 (N.D.Ind.1984).

The first summary amendment was filed according to Pre–Trial Order No. 1 which stated:

*Amendments to Pleadings.* Motions to amend have been filed on behalf of the McGahan plaintiffs and the UCIDA plaintiffs. The motions are granted. Should it become necessary at a future date for Mr. O'Neill to add additional

**5.** Eric Conner (tender/fish buyer); D & G Enterprises (fish processor); Al McNamara (fish trader); Randy & Rosemary Renner (fish buyer); Will Satathite (fish transporter); Paul Seaton (tender/fish buyer); Seasonal Seafoods (tender/fish marketer); David Valaer (fish spotter); and Icicle Seafoods, Inc. (fish processor).

plaintiffs with respect to his complaint, that addition shall be accomplished through the filing of an appropriate summary document reflecting such joinder and adoption of the McGahan plaintiffs' amended complaint herewith authorized. Defendants, therefore, had notice that additional plaintiffs were possible.

The only disputed claims not taken care of by the McGahan third amended complaint or summary amendment are those of David Valaer, a fish spotter who filed in December of 1989, and Icicle Seafoods, Inc., a fish processor who filed on March 12, 1990.

■ On the issue of relation back under Rule 15(c), defendants cite to *Atkin v. De-Havilland Aircraft Co.*, 699 P.2d 352 (Alaska 1985). However, the question of whether amendments to a complaint should relate back to the date of the original complaint is a question of federal procedure not controlled by state law. *American Banker's Insurance Co. v. Colorado Flying Academy, Inc.*, 93 F.R.D. 135, 137 (D.Colo.1982).

> Rule 15(c) provides, in pertinent part:
> (c) Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Although Rule 15(c) only refers to an amendment "changing the party", the courts have consistently held that the rule extends to the "addition" of parties also, even after the statute of limitations has expired, if the requisite notice and identity of interests showings are made. *Raynor Bros. v. American Cyanimid Co.*, 695 F.2d 382, 384 (9th Cir.1982); *Cunningham v. Quaker Oats Co.*, 107 F.R.D. 66, 72 (W.D.N.Y.1985); *United States v. Cook*, 580 F.Supp. 948, 946 (N.D.W.Va.1983).

■ Notice is the critical element in Rule 15(c) determinations. *Avila v. Immigration & Naturalization Service*, 731 F.2d 616, 620 (9th Cir.1984); *Staren v. American National Bank & Trust Co.*, 529 F.2d 1257, 1263 (7th Cir.1976). The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice the statutes of limitations were intended to provide. *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 1725 n. 3, 80 L.Ed.2d 196 (1984). Here, the defendants had sufficient notice that the oil spill from the *Glacier Bay* had given rise to litigation from all aspects of the commercial fishing industry in Cook Inlet.

■ At the hearing, defendants stated that in order for Rule 15(c) to apply, a legal or familial relationship must exist between the original plaintiffs and the new plaintiffs sought to be added. The issue was briefed in Trinidad's opposition memorandum. Trinidad stated in its brief that "identity of interest" was considered in assessing prejudice and sufficiency of notice to defendants under Rule 15(c) in order to ensure that the original plaintiffs and the new plaintiffs are sufficiently related so that the new plaintiffs were in effect involved in the proceeding from an early stage, citing *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1309 (D.C.Cir.1983). Trinidad further stated that an identity of interest has been found to exist when there is a familial or common ownership interest between new and original plaintiffs of which the defendants had notice. Trinidad's authorities were: *Avila v. Immigration & Naturalization Service*, 731 F.2d 616 (9th Cir.1984) (parent and child); *Allied International, Inc. v. International Longshoremen's Ass'n*, 814 F.2d 32 (1st Cir.

1987) (successor corporation); and *Hill v. BASF Wyandotte Corp.*, 782 F.2d 1212 (4th Cir.1986) (family ownership of damaged property).

While a large number of the cases allowing relation back under Rule 15(c) do involve legal or familial relationships, the language of Rule 15(c) does not impose a requirement for a legal or familial relationship. In *Leachman,* on which Trinidad relied, the court found persuasive the decision in *Williams v. United States,* 405 F.2d 234 (5th Cir.1968). The court in *Leachman* interpreted the holding in *Williams* to be that when a new plaintiff with a new claim is sought to be added after the statute of limitations has lapsed, something more is needed than mere notice to the defendant of the conduct or occurrence that gave rise to the claim. *Leachman,* 694 F.2d at 1308. The *Leachman* court noted that the *Williams* court expressly refused to decide whether the result, which allowed a parent's claim to relate back, would be different if the original plaintiff's next friend had been a "nonrelated person". *Leachman,* 694 F.2d at 1309.

Recently, the Third Circuit allowed additional unrelated plaintiffs to be added under Rule 15(c) in an age discrimination case. *Equal Employment Opportunity Commission v. Westinghouse Electric Corp.,* 869 F.2d 696 (3d Cir.1989). There the court held that the aggrieved employees seeking to be added did not prejudice defendant employer because the employer had notice that any employees adversely affected by its severance pay policies were potential plaintiffs. *Id.* at 704. Similarly, in *Glacier Bay,* the McGahan and UCIDA class complaints put defendants on notice that all those involved in the fishing industry in Cook Inlet were potential plaintiffs.

Defendants' claim that they would be prejudiced in discovery if relation back was allowed is not meritorious. Discovery was stayed by defendants' bankruptcy until the adoption of the Case Management Plan. Phase I discovery is scheduled to continue under the plan until October 15, 1990.[6]

The addition of new plaintiffs who are similarly situated to the original plaintiffs does not cause defendants any prejudice except that defendants incur the potential for increased liability. *Gregg Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 98 F.R.D. 715, 722 (N.D.Ill.1983). Increased liability is not sufficient prejudice to deny the relation back of such plaintiffs. *Id.*

### Conclusion

All TAPAA claims filed before March 31, 1990, are timely by previous stipulation. As to all state law claims filed before July 2, 1989, the earliest possible expiration of the limitations period, those claims are also timely. As to the claims filed after July 2, 1989, they would relate back under Rule 15(c) whether they were filed by putative class members or not, because defendants had notice that all of those in the Cook Inlet commercial fishing industry were potential plaintiffs. Therefore, there is no need for any factual determination to resolve the timeliness of those claims.

Plaintiffs' Phase I motions are granted to the extent that there is a determination that the claims of all plaintiffs are determined to be timely filed.

### III.

### FEES, COSTS & INTEREST

The last issue raised in plaintiffs' Phase I motions is whether plaintiffs are entitled under TAPAA and the Alaska Act to recover their costs and disbursements, attorney's fees, pre-judgment interest at the state rate of 10.5% annually, and post-judgment interest at the state rate of 10.5% annually. The issue as to attorney's fees was also raised in the Fund's motion to dismiss plaintiffs' prayer for attorney's fees. Plaintiffs responded and the Fund replied.

### Attorney's Fees

The Fund takes the position that the American Rule applies since TAPAA

---

6. Discovery is presently stayed pending a ruling in *In re the Exxon Valdez,* No. A89–095 Civil,

which might impact this case. Order on stay of proceedings (Sept. 14, 1990).

does not specifically authorize an award of attorney's fees to plaintiffs. The Fund notes that other environmental laws, such as the Clean Water Act, the Outer Continental Shelf Lands Act, and the Clean Air Act, in contrast, specifically provide for attorney's fees.

The Fund also argues that Rule 82, Alaska Rules of Civil Procedure, does not provide a basis for assessing attorney's fees against it since there are no state claims against the Fund. Furthermore, the Fund argues that this court has federal question jurisdiction over this matter, not diversity jurisdiction. The Fund contends that the intertwined relationship of the TAPAA claims with the state claims against other defendants should not subject the Fund to Rule 82 liability.

SPC Shipping argues that a ruling as to attorney's fees would be premature because any plaintiff who could not prove his claim or who was awarded an amount significantly less than he demanded would not be a prevailing party.

Trinidad echoes SPC Shipping's arguments, and also contends that Rule 82 is not applicable to maritime cases. Trinidad reasons that, since the case is under maritime law, the intertwining of TAPAA and state law claims would be irrelevant and not a basis for application of Rule 82.

Plaintiffs argue that their motion is not premature since it is not an attempt to litigate the actual amounts of attorney's fees. Rather, plaintiffs simply seek a ruling as to the applicable law regarding attorney's fees.

Plaintiffs contend that they should be able to recover attorney's fees under Rule 82 for their Alaska Act claims. Most of the plaintiffs originally filed their complaints in state court. This court exercises pendent jurisdiction over those claims now that defendants have successfully removed plaintiffs' cases here. Since TAPAA Section 1653(c)(9) authorizes the states to impose higher requirements and the TAPAA claims are factually indistinguishable from the Alaska Act claims, plaintiffs contend that Rule 82 should apply to all the attorney's fees.

In addition, plaintiffs advance the policy argument that the availability of attorney's fees would curtail any unnecessary litigation. Plaintiffs note that these strict liability claims were incurred over three years ago.

■ In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court affirmed the American Rule that, absent express statutory authority, bad faith, or willful disobedience of a court order, each party should bear the cost of its own attorney's fees. *Zambrano v. City of Tustin*, 885 F.2d 1473, 1481 (9th Cir.1989). Exceptions to the American Rule are narrowly circumscribed. *Miller–Wohl Co., ₁ Inc. v. Commissioner of Labor & Industry*, 694 F.2d 203, 204 (9th Cir.1982). TAPAA did not contain express statutory authority for awarding attorney's fees prior to the recent amendments contained in the Oil Pollution Act of 1990, which was enacted subsequent to the briefing on these motions but prior to oral argument.

The Oil Pollution Act of 1990 amended TAPAA in several ways, including elimination of the $14 million vessel owner's and operator's threshold liability. The applicable amendment reads as follows:

(d) *Payment Of Claims By Fund.*— Section 204(c)(3) of the Trans–Alaska Pipeline Authorization Act (43 U.S.C. 1653(c)(3)) is amended by adding at the end the following: "The Fund shall expeditiously pay claims under this subsection, including such $14,000,000, if the owner or operator of a vessel has not paid any such claim within 90 days after such claim has been submitted to such owner or operator. Upon payment of any such claim, the Fund shall be subrogated under applicable State and Federal laws to all rights of any person entitled to recover under this subsection. In any action brought by the Fund against an owner or operator or an affiliate thereof to recover amounts under this paragraph, *the Fund shall be entitled to recover prejudgment interest, costs,*

*reasonable attorney's fees, and, in the discretion of the court, penalties."*

Oil Pollution Act of 1990, Pub.L. No. 101–380, § 8102(d), 136 Cong.Rec. H6257 (daily ed. Aug. 1, 1990) (emphasis added). All of the litigation which has occurred so far in this case has been over the $14 million threshold liability of the vessel owner and operator. Plaintiffs have been doing, in effect, what has now become the Fund's job, only now the Fund is authorized to collect its attorney's fees.

· ■ Attorney's fees do not necessarily have to be denied simply because TAPAA does not specifically award them to plaintiffs. Although a congressional intent to include attorney's fees must be clear, it may be expressed in terms other than the use of those specific words. *Smith v. Califano*, 446 F.Supp. 530, 533 (D.D.C.1978). Congress clearly intended for TAPAA to provide adequate compensation to those who suffered damages from a TAPS oil spill. Congress also intended for victims of a TAPS oil spill to recover without necessarily resorting to lengthy and expensive litigation.[7] As amended, TAPAA provides for the burden of litigation to shift to the Fund, through the mechanism of subrogation, if the vessel owner and operator fail to pay TAPAA claims within ninety days.

Since the Fund can now recover attorney's fees from the vessel owner and operator in any subrogation action that the Fund brings, it is only fair that the plaintiffs, who have already done much of the Fund's work for it, should also recover reasonable attorney's fees. However, since the complexities of the subrogation mechanism provided for in TAPAA make it presently unclear to the court as to which attorney's fees might be recoverable and how any such fees might be determined, the court is unwilling to make a determination at this time on whether attorney's fees are recoverable under TAPAA and the Alaska Act.

Plaintiffs are likely to be the prevailing party for purposes of the declaratory motion by virtue of the case management stipulation as to liability. Individual plaintiffs, of course, have to prove damages. Any factual determinations that might alter that presumption as to specific plaintiffs can be made at the time the amount of any actual attorney's fees is addressed.

Plaintiffs' Phase I motions are denied to the extent that attorney's fees are determined to be recoverable by plaintiffs under TAPAA. The Fund's motion to dismiss the plaintiffs' prayer for attorney's fees is, likewise, denied.

### Costs

The Fund argues that federal law contained in 28 U.S.C. § 1920, Rule 54(d), Federal Rules of Civil Procedure, and Rule 21, Local General Rules, should control recovery of costs. The Fund further argues that witness fees should be determined according to 28 U.S.C. § 1821. Trinidad argues that federal law is applicable because this case is under maritime law or, alternatively, because costs are procedural in nature.

Plaintiffs argue for the application of state law, such as AS 09.70.010 and Rule 79, Alaska Rule of Civil Procedure, which is more generously interpreted than federal law regarding costs. *See Atlantic Richfield Co. v. State*, 723 P.2d 1249 (Alaska 1986) (awarded attorney's travel expenses, computer research, and paralegal expenses as costs); *Eagle Air, Inc. v. Corroon & Black/Dawson & Co.*, 648 P.2d 1000 (Alaska 1982) (awarded expert witness fees and attorney's travel expenses as costs). In the alternative, plaintiffs argue that this court has the discretion to award other costs besides those specified by statute and rule and that, in making such awards, it is proper for the court to consider what costs would have been recoverable in state court where the complaints were originally filed.

---

7. In contrast, the environmental statutes cited by defendants which specifically provide for attorney's fees all involve private attorney general suits where citizens are authorized to enforce compliance with certain environmental

standards through litigation. *See* Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(a)(5); Clean Air Act, 42 U.S.C. § 7604(d); Clean Water Act, 33 U.S.C. § 1365(d).

**1394**

 Federal law applies because costs are procedural in nature. The general rule on the taxation of costs is that the district court has discretion to fix those costs pursuant to Rule 54(d). *Johnson v. Pacific Lighting Land Co.*, 878 F.2d 297, 298 (9th Cir.1989). However, the discretion to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute. *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964).

 Taxable costs do not automatically include all expenses. *Hollenbeck v. Falstaff Brewing Corp.*, 605 F.Supp. 421, 439 (E.D.Mo.1984). Ordinary attorney's travel costs for depositions, pre-trial conferences and trial, long-distance phone calls, Federal Express and local delivery service, office expenses, postage, and typing charges are not "costs" as that term is used in 28 U.S.C. § 1920, but are in fact out-of-pocket expenses. *Id.; Wahl v. Carrier Mfg. Co.*, 511 F.2d 209, 217 (7th Cir.1975).

 Since the rules regulating witness fees are more procedural than substantive, federal law, not state law, is applied in determining whether to allow expert witness fees. *Ackerman v. Western Electric Co.*, 113 F.R.D. 143, 145 (N.D.Cal. 1986). The general rule is that where expert witnesses are involved, the prevailing party can recover only the statutory amounts prescribed in 28 U.S.C. § 1821 and not additional expert witness fees. *Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 444 (7th Cir.1988). However, a strong trend has developed allowing trial courts to exercise their discretion by awarding fees for expert witnesses as costs in those cases where exceptional circumstances can be demonstrated. *Heverly v. Lewis*, 99 F.R.D. 135, 137 (D.Nev.1983). The required special circumstances are largely a matter of the reasonable needs of the party in the context of the litigation. *Thornberry v. Delta Air Lines, Inc.*, 676 F.2d 1240, 1245 (9th Cir.1982), *vacated on other grounds*, 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983). The determination of whether an expert's testimony was essential to a material issue is more accurately made in retrospect after the testimony has been given. *Heverly*, 99 F.R.D. at 137.

Plaintiffs' Phase I motions are granted only to the extent that federal law is determined to control as to costs recoverable by plaintiffs. The court makes no ruling, at this time, as to any particular item of costs.

### Interest

Plaintiffs request a determination that they are entitled to both pre-judgment and post-judgment interest. Plaintiffs further request that such interest be computed at the state law rate of 10.5% annually. AS 09.30.070.

The Fund and Trinidad both argue that a determination on the availability of interest is premature because it turns on factual determinations. Furthermore, they argue post-judgment interest requires a final judgment. Defendants contend that pre-judgment interest, while generally available in maritime cases, can be denied for such things as unwarranted delay in presenting a claim. *Stevens Technical Services, Inc. v. S.S. Brooklyn*, 885 F.2d 584, 590 (9th Cir.1989). Defendants note that some plaintiffs waited over two years to file their complaints. Defendants contend that pre-judgment interest can also be denied where there is a large discrepancy between the amount of damages demanded and the size of the eventual award. *James B. Lansing Sound, Inc. v. National Union Fire Insurance Co.*, 801 F.2d 1560, 1570 (9th Cir.1986). Trinidad further argues that even if the state interest rate is applied, the proper triggering event is the day process was served, not the date of the tort. AS 09.30.070(b).

Plaintiffs argue that pre-judgment interest is allowed for the Alaska Act claims and that interest should be extended to the entire recovery, including the TAPAA claims, because the different claims involve the same facts and are interrelated. *See Farnsworth v. Steiner*, 638 P.2d 181, 184 (Alaska 1981) (creditors are entitled to the time value of the compensation for their injuries in all civil cases); *Columbia Brick Works, Inc. v. Royal Insurance Co.*, 768

F.2d 1066, 1071 (9th Cir.1985) (a court may choose the local rate of interest in its discretion if the equities demand). This, plaintiffs contend, would serve the purposes behind awarding interest, which are to reflect the present value of the award and to eliminate any incentives to delay litigation.

■ The decision to grant pre-judgment interest rests with the discretion of the court. *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1106 (9th Cir.1985). No federal statutory law addresses whether pre-judgment interest is generally available. *In re Air Crash Disaster Near Chicago,* 480 F.Supp. 1280, 1282 (N.D.Ill.1979). The Seventh Circuit recently announced a rule that pre-judgment interest should be presumptively available to victims of federal law violations, because without it plaintiffs' compensation would be incomplete and the defendants would have incentive to delay. *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431, 436 (7th Cir.1989).

■ Pre-judgment interest should be awarded to plaintiffs in this case because their recovery would be incomplete otherwise and because the TAPAA amendments specifically authorize the award of pre-judgment interest to the Fund in subrogation actions against the vessel owner and operator. The plaintiffs have essentially done the work for the Fund up to this point.

■ The proper interest rate is that established by 28 U.S.C. § 1961. The measure of interest rates prescribed for post-judgment interest in 28 U.S.C. § 1961 is also appropriate for fixing the rate for pre-judgment interest unless the equities of a particular case demand a different rate. *Columbia Brick Works, Inc. v. Royal Insurance Co. of America,* 768 F.2d 1066, 1071 (9th Cir.1985).

Sufficient equities were not argued to justify using the local rate. The only argument advanced by plaintiffs was that the state claims were interrelated with the federal claims and that the cases were originally filed in state court. At this point, it is sufficient to rule that pre-judgment in-terest is appropriate and that it will be computed at the federal rate.

Post-judgment interest is determined by federal law at the statutory rate of 28 U.S.C. § 1961. *James B. Lansing Sound, Inc. v. National Union Fire Insurance Co.,* 801 F.2d 1560, 1570 (9th Cir.1985).

Plaintiffs' Phase I motions are granted to the extent that it is determined that plaintiffs are entitled to recover pre-judgment interest and post-judgment interest, both computed at the rate provided for by federal law.