UNITED STATES of America, Plaintiff,

v.

John Norman COOK, Defendant.

Crim. No. 82–00082–E(H).

United States District Court,
N.D. West Virginia,
Elkins Division.

May 31, 1983.

William A. Kolibash, U.S. Atty., Wheeling, W.V., for plaintiff.

George J. Cosenza, Parkersburg, W.V., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

On December 17, 1982, the Grand Jury returned a four-count indictment against the Defendant which charged him with having knowingly made a firearm without hav-

ing received an approved application for doing so, in violation of 26 U.S.C. § 5861(f) [Count One], having maliciously damaged by means and use of an explosive a building which was then being used for activities affecting interstate commerce, in violation of 18 U.S.C. § 844(i) [Count Two], having knowingly possessed an unlawfully made firearm, in violation of 26 U.S.C. § 5861(c) [Count Three], and having knowingly possessed a firearm which had not been registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d) [Count Four]. After a four-day trial, a jury returned a verdict against the Defendant on all four counts, and the Court entered judgment accordingly. Currently pending before the Court is the Defendant's timely motion for a new trial, filed May 5, 1983. For the reasons set out below, this Court hereby denies the Defendant's motion.

### I. *Sufficiency of the Evidence*

■ The Defendant does not dispute the fact that at approximately 6:00 a.m. on November 4, 1982, a pipe bomb was detonated in front of the building at 402 Avery Street, wherein William Kiger then maintained his law office in Parkersburg, West Virginia. The Defendant does maintain, however, that there is insufficient evidence to support the jury's verdict that he unlawfully made, possessed[1] and maliciously detonated that destructive device.[2]

When viewing the evidence in a light most favorable to the Government,[3] it appears that in approximately June, 1980, the Defendant became romantically involved with Phyllis Bobier. By the following Spring, the Defendant found himself being outmaneuvered for Ms. Bobier's affection

by her employer, William Kiger. In approximately the early part of October, 1982, the Defendant began following Kiger on several occasions. Between September and November, 1982, the Defendant visited Evelyn Anthony, a card reader, on several occasions in an effort to discover what Kiger and Bobier were doing. Between 6:30 and 7:00 p.m. on the day of the bombing, the Defendant again visited Anthony and told her that Kiger's office had been bombed and proceeded to describe the bomb as being essentially a piece of gas pipe which had been activated by a radio signal. On November 6, 1983, the Defendant informed Louis Denver Huggins, Jr., an investigator with the West Virginia Fire Marshal's Office, that someone with his electronics background could build a destructive device like the one that had been detonated in front of Kiger's office and that he had been deeply depressed over Kiger's relationship with Bobier and that the thought of killing Kiger had occurred to him.

On November 6, 1982, a one-fourth inch drill bit and a circuit board containing various electronic components similar to the ones found in the remains of the destructive device, were seized during a consent search of the Defendant's workshop. Pursuant to a warrant search of the Defendant's residence on November 9, 1982, the Government also seized, *inter alia*, a roll of gold lamp wire, several powder cans and a green rubber glove which were found in a brown paper bag in the Defendant's bathroom closet.

Albert W. Gleason, an Explosives Enforcement Officer with the Bureau of Alco-

---

**1.** The Government introduced into evidence a self-authenticating document which indicates that the Defendant neither received an approved application for making this destructive device, nor that he had registered it in the National Firearms Registration and Transfer Record. *See,* Government Exhibit 6B; *Rule* 902, Federal Rules of Evidence.

**2.** The testimony of Dr. Conrath, an optometrist, and of Mr. Kiger, a lawyer, provided an ample basis for the jury to conclude that the building at 402 Avery Street which housed their offices

on November 4, 1982, and with which the Defendant is charged with having maliciously damaged by means of a destructive device, was then being used for activities which at least had a *de minimus* effect on interstate commerce. *Cf., U.S. v. Giordano,* 693 F.2d 245 (2d Cir.1982) (*de minimus* effect on interstate commerce held sufficient under 18 U.S.C. § 844(i)); *U.S. v. Andrini,* 685 F.2d 1094 (9th Cir.1982) (collecting cases).

**3.** *Glasser v. U.S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

hol, Tobacco and Firearms, who had examined the bomb fragments, testified that the bomb had consisted, *inter alia,* of a forty channel Realistic citizens band [CB] radio, four six-volt lantern batteries, various switching and fusing components, and a pipe which contained a mixture of black and pyrodex powders. Gleason further testified that the circuit board, containing various electronic components, which was seized from the Defendant's workshop on November 6, 1982, was very similar to the one used in the destructive device.

Benjamin Wilson, a fingerprint analyst, testified that he had examined and compared the latent fingerprints on the powder cans which were found in the Defendant's bathroom closet with the ink prints which were taken from the Defendant on November 6, 1983, and concluded that the latent prints on the powder cans were made by the Defendant. Wilson further testified that there were not any unidentified latent fingerprints on these powder cans.

After having examined and compared the bomb fragments with the articles which were seized from the Defendant's residence and workshop, Willard Washington, a forensic chemist, testified (1) that the roll of gold wire which had been found in the Defendant's residence had the same distinctive defect in the manufacturer's stamp as did the similar gold wire which was used in the destructive device, (2) that the one-fourth inch drill bit which had been seized from the Defendant's workshop had paint and metal particles on it which were similar to the paint on, and metal in, a fragment of the bomb which had a one-fourth inch hole drilled in it, and that the pattern of the hole matched the pattern of the drill bit, (3) that there was an impression on the black paint found on one of the bomb fragments which matched the pattern on the palm of the green rubber glove [which had black paint on its palm] which was found in the Defendant's home, and (4) that the black and

pyrodex powder cans which had been found in the Defendant's bathroom closet contained particles of other powders than the one designated on their respective labels, indicating that these different powders had been mixed together.

The testimony of Walter E. Cain, Sr., James R. Fike, Earl Vincent, John Sciullo, Donald L. Wallace and Harley Rasel indicates that between mid-October and early November, 1982, the Defendant purchased various electronic components similar to the ones used in the destructive device. Moreover, Charles Nedeff, who along with his brother, David, own a pawn shop, testified that he had received the forty-channel Realistic CB radio, Serial No. 496372, which was used in the bomb, into his pawn shop's inventory on May 2,. 1978. His brother, David Nedeff, testified that he sold *this CB radio to the Defendant* on October 29, 1982.

Accordingly, the Court finds that there was ample evidence upon which the jury concluded beyond a reasonable doubt that the Defendant was guilty of each of the four counts in the within indictment.

## II. *The Government's Failure to Comply With Rule 16, Federal Rules of Criminal Procedure*

■ During the direct examination of William Kiger, the Government moved the admission of a City of Vienna water bill addressed to Kiger which had been seized from the Defendant's residence on November 9, 1982. The Defendant objected [4] to the introduction of this evidence on the grounds that the Government had not previously shown it to him, notwithstanding his prior request to examine the documents which the Government intended to introduce at trial in its case-in-chief. *See* ¶ 3 of Defendant's motion for discovery, filed January 31, 1983. Inasmuch as the Court did not find any bad faith on the Government's part, and having further found that the Defendant was not unfairly surprised [5]

---

**4.** *See Rule* 16(d)(2), Federal Rules of Criminal Procedure.

**5.** Defendant's counsel indicated that he had reviewed Agent Sheridan's receipt for the items

seized on November 9, 1982, from the Defendant's residence at 1722 Latrobe Street. The ninth item catalogued on Sheridan's receipt adequately referred to this particular piece of evi-

and prejudiced by the introduction of the water bill, the Court properly admitted it into evidence. *Cf., U.S. v. Armes,* 470 F.2d 1353 (6th Cir.1972) *cert. denied* 410 U.S. 967, 93 S.Ct. 1450, 35 L.Ed.2d 702 (1973).

### III. *Flight Instruction*

During the late evening and early morning hours of November 5–6, 1982, Agent Sheridan and a number of other federal, state and local law enforcement officers, after having identified themselves and advising the Defendant of his constitutional rights, questioned the Defendant about his involvement in the November 4 bombing incident. At the conclusion of this interrogation session, the officers conducted a consent search of the Defendant's place of business and garage from which they seized a number of items. Some three days later, on November 9, 1982, Sheridan obtained and executed search warrants for the Defendant's place of business, garage and residence. Sheridan testified that as he was approaching the Defendant's place of business to execute the warrants, that he saw the Defendant take flight after he looked in the direction from which Sheridan was approaching. Agents Sheridan and Webb further testified that they were unable to locate the Defendant on November 9, notwithstanding their thorough search of the premises for him. While on the witness stand, the Defendant admitted that he hid himself in his place of business when he saw Sheridan approaching and that he was subsequently able to escape from the premises when the officers concentrated their efforts to find him in a distant part of the building. On the following day, after having spent the night at the home of a friend in the Parkersburg area, the Defendant voluntarily surrendered himself to Sheridan after he had learned that a warrant had been issued for his arrest.

On the basis of this evidence, the Court instructed the jury on the inferences which it could draw from the Defendant's flight when he saw Sheridan approaching him on November 9, 1982, as follows:

"The intentional flight or concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not of course sufficient in itself to establish his guilt; but is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence. Whether or not evidence of flight or concealment shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury. In your consideration of the evidence of flight and concealment, you should consider that there may be reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness. Let me suggest also that a feeling of guilt does not necessarily reflect actual guilt."

I Devitt & Blackmar, *Federal Jury Practice & Instructions*, § 15.08 at 460–61. Without specifying the basis for his objection, the Defendant now maintains that the Court improperly instructed the jury concerning the Defendant's flight.

In *U.S. v. Foutz*, 540 F.2d 733, 739–40 (4th Cir.1976), the defendant was advised over the telephone by a police officer on March 15, 1972, that he was wanted in connection with two bank robberies. After the defendant failed to voluntarily surrender himself to the authorities, he was arrested on March 23, 1972. Inasmuch as Foutz did not actually flee from where he normally resided, but rather merely failed to voluntarily surrender to the police, the district court refused to give a flight instruction to the jury. The trial court, however, did allow the Government to argue to the jury that the defendant's failure to turn himself in after he knew that he was wanted in connection with the two bank robberies manifested a consciousness of guilt. The Fourth Circuit found that the district court erred in allowing the Government to

dence and gave Defendant's counsel sufficient notice of it.

make this argument to the jury where the record indicated that the defendant was afraid that if he turned himself in on the bank robbery charges that he would be incarcerated in any event for an unrelated parole violation.[6]

In *U.S. v. Beahm*, 664 F.2d 414 (4th Cir.1981), the defendant was convicted on two counts of taking indecent liberties with children, in violation of *Va.Code*, § 18.2–370(2). Inasmuch as the defendant was alleged to have committed these offenses on a federal military reservation, he was prosecuted in federal court under the Assimilative Crimes Act, 18 U.S.C. § 13. The defendant was alleged to have committed the offenses on August 19, 1979. The evidence at trial indicated that the defendant left for Florida some three weeks later on September 7, 1979, immediately after having found a note on his door from an F.B.I. agent who requested that the defendant contact him. The evidence further indicated that the note neither referred to the alleged incidents of August 19, nor indicated that the F.B.I. wanted to arrest him for, or suspected him of being involved in that incident. On the basis of this evidence, the trial court instructed the jury that it could "consider [the] defendant's flight 'immediately after ... the commencement of an investigation of a crime' in determining [his] guilt or innocence." *Id.* at 419.

■ On appeal, the Fourth Circuit held that the trial court erred in giving this instruction, which equated flight after "the commencement of an investigation" with flight after being "accused" of a crime.

While the Court of Appeals conceded that "[u]nder some circumstances 'commencement of an investigation' could be equated with accusation," it found it inappropriate for the trial court to have done so in *Beahm*, where the Government failed to adequately substantiate the inference that at the time he fled the defendant knew that he was wanted for, or suspected of the crimes for which he was later prosecuted. *Id.* at 420. Under *Beahm*, therefore, the Government is only entitled to a flight instruction where the evidence in the case "sturdily" supports each of the following inferences: [7]

> "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

*U.S. v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977) *cert. denied* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). *Cf., U.S. v. Borders*, 693 F.2d 1318, 1324–28 (11th Cir. 1982).

■ In the case at bar, the Defendant expressly admitted that he fled when he saw Sheridan approaching him on November 9, 1982. Accordingly, the Court need not concern itself with whether there was sufficient evidence to support the threshold inference of flight from the Defendant's behavior. When viewing the evidence in a light most favorable to the Government,[8] the Court finds that there is sufficient evidence to "sturdily" support the three remaining inferences set out above, (1) inas-

---

**6.** The *Foutz* court stated:

"The inference that one who flees from the law is motivated by consciousness of guilt is weak at best, and the district court properly recognized that the strength of the inference is further attenuated when a defendant has not actively sought to avoid capture. The danger of permitting the inference is further compounded in a case such as this one where the defendant is wanted for another infraction. '[I]n many situations, the inference of consciousness of guilt of the particular crime [based upon flight] is so uncertain and ambiguous and the evidence so prejudicial that one

is forced to wonder whether the evidence is not directed to punishing the "wicked" generally rather than resolving the issue of guilt of the offense charged. Particularly troublesome are the cases where defendant flees when sought to be arrested for another crime, or is wanted for another crime' ...."
*U.S. v. Foutz, supra,* at 740.

**7.** *U.S. v. Beahm, supra,* at 420, *citing U.S. v. Myers, supra,* at 1049.

**8.** *Glasser v. U.S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

much as the jury could have reasonably inferred that the Defendant knew that he was a suspect in the November 4 bombing investigation when he fled in response to Sheridan's approach on November 9, only three days after having been extensively questioned by Sheridan and other law enforcement officers about his involvement in that bombing incident, *cf., U.S. v. Beahm, supra,* (2) and since there was no evidence which would indicate that the Defendant might have fled because of guilt feelings about any unrelated criminal conduct, *cf., U.S. v. Foutz, supra.*[9] Accordingly, the Court finds that it did not err in instructing the jury on the inferences which it could draw from the Defendant's flight.[9A]

## IV. *Hearsay Ruling*

■ During the course of the Defendant's testimony, the Government objected to the Defendant testifying about the details of a conversation which he allegedly had with an unidentified, "mystery" woman on the morning of November 9, 1982. In response to the Government's objection, Defendant's counsel maintained that the Defendant's testimony concerning this conversation was not hearsay, since it was not being offered to prove the truth of the matter asserted.[10] *Cf.,* 4 *Weinstein's Evidence,* ¶ 801(c)[01] (1981). Inasmuch as Defendant's counsel indicated that parts of the alleged conversation would "verify" portions of the Defendant's original testimony, the Court properly sustained the Government's hearsay objection, finding that the jury would be unable to disregard those inadmissible portions of the alleged conversation from the remainder.

Even assuming, *arguendo,* that the Court did err in excluding this testimony, the Defendant has failed to demonstrate to the Court that any such error was prejudicial to his right to a fair trial where a record was not made of the excluded testimony.[11]

## V. *Chain of Custody*

■ The Defendant maintains that the Court improperly admitted into evidence items seized from his residence and place of business, contending that the Government did not establish a continuous chain of custody of these items. The testimony at trial indicates that these items were kept in Agent Sheridan's possession after they were seized on November 6 and 9, 1982. After having received these items from Sheridan on November 10, 1982, Detective Lyons of the Parkersburg Police Department transported them to the Bureau of Alcohol, Tobacco and Firearms laboratory in Rockville, Maryland, where they were initially examined by Albert Gleason, an ATF Explosives Enforcement Officer. After Gleason conducted a cursory examination of these items, Lyons transported them to the ATF lab in Washington, DC, where he surrendered them to Benjamin

---

**9.** Moreover, the Court instructed the jury that in considering any evidence of flight or concealment, it should consider whether there were any reasons for it which would be consistent with innocence. *See,* Devitt & Blackmar, *supra,* at § 15.08.

The Defendant testified that he hid himself when he saw Sheridan approaching on November 9, 1982, because he had just discovered the brown grocery bag containing the gold lamp wire and empty powder cans which he maintained had been "planted" in his bathroom closet and because he thought that Sheridan was reaching underneath his coat for his gun while he was approaching the Defendant.

**9A.** Even assuming, *arguendo,* that it did err by instructing the jury in this regard, the Court nevertheless finds beyond a reasonable doubt that such error was harmless given the over-

whelming evidence of the Defendant's guilt. *Cf., Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Anderson v. Warden, Maryland Penitentiary,* 696 F.2d 296 (4th Cir.1982) (*en banc*).

**10.** Subject to the exceptions contained in *Rules* 803 and 804, Federal Rules of Evidence, *Rule* 802, Federal Rules of Evidence, generally proscribes the admission of hearsay, which *Rule* 801(c), Federal Rules of Evidence, defines as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted.*" (emphasis added).

**11.** *See generally, U.S. v. Simms,* 508 F.Supp. 1188, 1201–03 (W.D.La.1980) (discussing the defendant's burden of proof on a *Rule* 33 motion for a new trial).

Wilson, an ATF Fingerprint Analyst. After Wilson completed his examination of these items for fingerprints, he surrendered them to Willard Washington, an ATF Forensic Chemist. After Washington completed his analysis of these items, he sent them back to Gleason at the Rockville lab, via an ATF courier. When Gleason concluded his second examination of these items, he mailed them by registered or certified mail back to Agent Sheridan, who produced them at trial on April 25, 1982.

The only *possible* [12] breaks in this custody are (1) the anonymous ATF mail room courier who took these items from Mr. Washington at the Washington, DC, lab and transported them to Mr. Gleason at the Rockville lab, and (2) the period of time when these items were in the hands of the Postal Service. In the absence of clear evidence to the contrary, however, the presumption of regularity which attaches to the actions of public employees is dispositive of this issue. *See Pasadena Research Laboratories v. U.S.,* 169 F.2d 375, 381–82 (9th Cir.) *cert. denied* 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401 (1948) (postal employees and shippers), *quoting U.S. v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926).

VI. *The Court's Ruling on the Defendant's Motion for an Acquittal*

The Defendant's final contention is that the Court erred in denying his motion for an acquittal at the close of the evidence, inasmuch as the evidence was insufficient to establish the alleged offenses. The Defendant also argued that Count Two was fatally defective since it only alleged that the damaged building was "being used by ... activities affecting interstate commerce" as opposed to alleging that the building was being used in interstate commerce. Given the Court's prior analysis of the sufficiency of the evidence in this action [Part I, *supra*], the Court finds that it properly denied the Defendant's *Rule* 29(a)

motion on this ground. Moreover, the Defendant's argument as to Count Two is clearly without merit inasmuch as the language of Count Two tracked the language of 18 U.S.C. § 844(i), which provides in pertinent part as follows:

"Whoever maliciously damages ... by means of an explosive, any building, ... used in interstate ... commerce *or in any activity affecting interstate ... commerce* shall be [guilty of an offense against the United States]." (emphasis added) [13]

### VII. ORDER

Having concluded that each of the six grounds raised by the Defendant in support of his motion for a new trial, filed May 5, 1983, are without merit, the Court hereby denies the Defendant's aforementioned motion.

The Clerk is directed to send a certified copy of this Memorandum Opinion and Order to counsel of record.

---

12. "The only suggestions of mishandling are in the form of *dire possibilities* conjured up by resourceful counsel. But possibilities are not proof." *Pasadena Research Laboratories v. U.S., supra* at 382.

13. *Cf., U.S. v. Giordano, supra; U.S. v. Andrini, supra.*